IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2024

**IN RE DESTINEY S., ET AL.**

**Appeal from the Circuit Court for Meigs County**
**No. 2022-CV-15 & 2022-DV-54  Michael S. Pemberton, Judge**

_____

**No. E2023-00895-COA-R3-PT**
_____

The Department of Children's Services filed a petition to terminate the mother's parental rights to her five children on multiple grounds. The trial court found that grounds had been proven and that termination of the mother's parental rights was in the children's best interests. The mother of all five children appeals. For the reasons stated below, we vacate that part of the judgment terminating Mother's parental rights to Destiney S. and Serenity S. because they attained the age of majority prior to the entry of the final judgment. As for the three youngest children, Aurora R., Kanan R., and Kyaion R., we affirm the trial court's determination that grounds for termination of Mother's parental rights were proven and that termination of Mother's parental rights is in their best interests. Accordingly, we affirm the termination of Mother's parental rights to Aurora R., Kanan R., and Kyaion R.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Vacated in Part and Affirmed in Part**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, Bridget R.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

_____

[1] This court has a policy of protecting the identity of children by initializing the last names of the children, parents, close relatives, and pre-adoptive parents and by not providing the children's exact birth dates.

On March 28, 2022, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Bridget R. ("Mother") and Aaron S., who are the parents of Destiney S. and Serenity S., twins who were born in July 2005, and to terminate the parental rights of Mother and Joseph R., who are the parents of Aurora R., born in August 2017, Kanan R., born in April 2020, and Kyaion R., born in May 2021.[2] The initial petition asserted multiple grounds for termination of the parents' rights. DCS filed an amended petition on June 14, 2022, to add the ground of severe child abuse against Mother.

Aaron S.'s parental rights were terminated by default pursuant to an order entered on November 3, 2022. The case against Mother and Joseph R. was tried before the Meigs County Circuit Court on March 20, 2023. Five witnesses testified, all of whom were called by DCS.

Mother and Joseph R., the father of the three youngest children, testified. Significantly, the trial court expressed concerns in respect to Mother's candor on several issues. As the court stated, it "certainly had credibility issues with her testimony." Both parents admitted a long history of drug use, and both discussed Mother's use of illegal drugs during her pregnancy with the youngest child, Kyaion R. Joseph R. also explained that the four oldest children had been in his mother's custody for almost a year before they went in to DCS custody because his mother was no longer able to care for them.

Moreover, concerning Mother's history of drug use, she admitted that she had used drugs for ten years, had "used all of them," but the last time she used was "about four months ago." On April 19, 2021, which was close to the time that the children came into DCS custody, Mother tested positive for methamphetamines and amphetamines. While she was somewhat hesitant to admit that she refused to submit to further drug screens, she admitted that she did not take the nail bed test required by the court because she was still using drugs. As for her visitation with the children subsequent to their removal, Mother admitted that she had not exercised much visitation. She blamed DCS and the foster parents, claiming that they had canceled her scheduled visits "a lot." She acknowledged that the last visit she had with any of her children was on April 21, 2021. She also admitted that once the Meigs County Juvenile Court suspended visitation until she took and passed a drug screen, she did not submit to a screen. She blamed this on not having transportation to get to the testing facility, but later stated that she knew she could not pass the test because she was still using drugs. As to her drug use when she was pregnant with Kyaion R., she testified that she was on illicit drugs when he was born.

---

[2] Mother is the mother of all five children. The parental rights of both fathers were terminated, but neither father appeals the termination of his rights. Mother is the only appellant.

As to her bond with the children, Mother admitted that she did not have one with Kyaion R. She testified that she did have bonds with the other four children, despite the fact that she had not seen them since April 2021. Specifically, she testified that her seventeen-year-old twins, Destiney S. and Serenity S., lived with her from their birth until they were removed in April 2021, except for approximately a one-year period of time when she was in jail.

DCS then called Macy Burton, a DCS Family Services Worker who has been involved with the children since July 2021, as a witness. She testified that, at the time she first became involved, the children were in the custody of the paternal grandmother, who was getting evicted from her home. As a result of her pending eviction, DCS took custody of the children from the grandmother.

Ms. Burton testified that Mother was difficult to maintain contact with and that several months would pass with no contact. When they would have contact, Ms. Burton would review the permanency plan with Mother and that she would usually storm out of the meeting shortly after a discussion about the children. Ms. Burton stated that the Initial Permanency Plan was established on March 27, 2021, and that Mother and Joseph R. visited with the children during March and April 2021, but missed the visit during May 2021. She testified that it was during the June 8, 2021 court appearance wherein the Juvenile Court, sua sponte, ordered that the parents submit to nail bed drug testing before any further visitation would occur.

Ms. Burton testified that a permanency plan was promulgated in September 2021. While Mother completed a parenting class and an alcohol and drug assessment, she later failed drug screens and was discharged from treatment in October 2022 due to her failure to attend. Ms. Burton stated that to her knowledge Mother did not complete a drug treatment plan as required by the permanency plan. Specifically, as to the drug use/screens/tests, Ms. Burton stated that Mother tested positive on June 22, 2021 for illicit drugs and that at a subsequent encounter on September 20, 2021, she was told by Mother that she was taking suboxone. However, when asked to provide a prescription for same, Mother failed to do so. The same is true for the October 8, 2021 visit she had with Mother. She testified that DCS arranged for the nail bed tests pursuant to the Meigs County Juvenile Court order, but Mother failed to appear multiple times to take the test, despite being given the address for the testing facility. Ms. Burton testified that Mother had not "worked her [permanency] plan." Ms. Burton also stated that DCS had exhausted its options prior to filing this petition.

With regard to the children, Ms. Burton said that she sees them on a monthly basis. She testified that she has never heard the youngest three children speak about their parents. Ms. Burton further testified that although the older two have mentioned their parents on occasion, both older children have expressed a clear preference to stay with the foster

parents and be adopted. Ms. Burton concluded that all five children were in the same foster home and doing "really well" and have a good bond with their foster parents.

DCS also called Felicia Nepp as a witness. Ms. Nepp works with Omni Visions, an agency affiliated with DCS related to foster care. Ms. Nepp's involvement has solely been with the children, with whom she interacts on a bi-weekly basis. As to Aurora R. and Kanan R., they have been in foster care through Omni Visions since December 2021. Ms. Nepp stated that Aurora had a lot of separation anxiety, but with therapy and the current foster home placement, she is doing much better and will be starting kindergarten this coming fall. With respect to Kyaion R., Ms. Nepp testified that he is also doing much better, that occupational therapy is helping him, but that he is not old enough to start school. As to Kyaion, she stated that he needs a lot of daily care and attention due to his health issues, chief among those is a recent diagnosis of cerebral palsy. However, she said that he is doing better and continues to improve.

DCS then called the foster parent, Bjorn C., as a witness. He testified that he and his wife have three children of their own residing in their home, in addition to Mother's five children. He stated that Kyaion was the first to be placed with them in July 2021, when he was only six weeks old. Other than his cerebral palsy diagnosis, which affects his right side, he has no other health conditions. The other four children were placed with them in January 2022, when they were ages sixteen, sixteen, four, and two years of age. As to Kyaion, who was two years old at the time of trial, Mr. C. testified that he had extreme tantrums, was aggressive, did not sleep well, and had night terrors at first; however, he has improved dramatically over the course of the last fourteen months.

After the trial concluded, an initial order terminating parental rights of Mother and both fathers was entered on June 2, 2023. Upon motion of DCS, an amended order was entered on August 1, 2023, to address the ground of severe child abuse, which had been inadvertently omitted from the initial order. As we will discuss in more detail below, the two oldest children, the twins, who were born in July 2005, turned eighteen years old prior to the entry of the final order terminating Mother's parental rights to the children. Thus, the twins attained the age of majority prior to the entry of the final judgment from which this appeal lies.

With regard to Mother, who is the only parent appealing the termination of her parental rights, the court found that DCS proved the grounds of severe child abuse, abandonment by failing to visit the children, and failure to manifest an ability or willingness to assume custody of the children. The court also found that termination was in the best interests of the children. Based on these findings, the court terminated Mother's parental rights to all five children. This appeal by Mother followed.

- 4 -

Mother presents two issues for our review:

1. Did the trial court err in terminating parental rights to the two oldest children who were adults when the final order was entered?
2. Did the trial court err in finding, by clear and convincing evidence, that termination was in the best interests of the children?

Although Mother does not challenge any of the grounds for termination that the trial court found were proven, "this [c]ourt is required 'to review thoroughly the trial court's findings as to each ground for termination[.]'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016)). Thus, we shall review the grounds the court found to have been proven as well as the two issues Mother presents.

## STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citation omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016).

In an appeal, "this [c]ourt is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must "determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to

clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

The trial court's findings of fact are reviewed de novo upon the record with a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Questions of law, however, are reviewed de novo with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524.

## ANALYSIS

### I.   DESTINEY S. AND SERENITY S., THE TWINS

Mother's first issue reads: "Did the trial court err in terminating parental rights to the two oldest children [Destiney S. and Serenity S., the twins] who were adults when the final order was entered?"

The factual basis supporting this argument is that the trial court entered its initial order terminating Mother's parental rights to all five children on June 2, 2023. Then, on June 23, 2023, DCS filed a motion to alter or amend that order, noting that the order did not address the ground of severe abuse. On August 1, 2023, the trial court entered its final order terminating parental rights with respect to all five children. In the interim, however, on July 20, 2023, the twins turned 18, at which time they reached the age of majority.

As Mother notes in her brief, the termination statute speaks of terminating parental rights "to a child." Tenn. Code Ann. § 36-1-113(a). Tennessee Code Annotated § 36-1-102(13) (2021)[3] defines a child or children as any person or persons under the age of eighteen (18) years old. It also defines an adult as any person who is eighteen (18) years of age or older. Tenn. Code Ann. § 36-1-102(8) (2021). While the statute provides that "an adult can be adopted as provided in this part," adoption is not at issue in this case, as the petitions sought merely to terminate parental rights. Tenn. Code Ann. § 36-1-102(8) (2021). For these reasons, Mother argues that the trial court did not have the statutory authority to terminate her parental fights to the twins, Destiney S. and Serenity S.

DCS concedes this issue. In its brief, DCS states:

[T]ermination of Mother's and Mr. [S.'s] parental rights to Destiney and Serenity [the twins] is moot, as termination is only applicable to children. See Tenn. Code Ann. §§ 36-1-102(14) (defining child and children as any person or persons under eighteen (18) years of age) & 36-1-113(a) (granting

---

[3] The amended petition to terminate parental rights, which is the operative petition, was filed June 14, 2022. Throughout, we refer to the applicable version of the statute, the version in effect at the time the amended petition was filed. *See In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *4 (Tenn. Ct. App. Mar. 8, 2023).

courts jurisdiction to terminate parental rights to a child); *see also In re Samone D.*, No. W2021-01225-COA-R3-PT, 2023 WL 1962016, at *1 (Tenn. Ct. App. Feb. 13, 2023) (Because Samone turned eighteen years old during the pendency of this appeal, the termination of [f]ather's parental rights as to Samone is moot. Therefore, [f]ather's parental rights to Samone are not at issue in this appeal.) (internal citation omitted) (no perm. app. filed); *In re K.H.*, No. W2008 01144-COA-R3-PT, 2009 WL 1362314, at *12 (Tenn. Ct. App. May 15, 2009) (Regardless, the issue is moot. During the pendency of this appeal, K.H. reached majority, and the termination of [m]other's parental rights as to her is not an issue in this appeal.) (no perm. app. filed).

For the reasons stated in their briefs, we agree with Mother and DCS. Accordingly, we vacate the ruling by the trial court that terminates Mother's parental rights to the twins, Destiney S. and Serenity S.

## II. GROUNDS

Termination of parental rights must be based, in part, upon a finding by the court based upon clear and convincing evidence that one or more grounds for termination of parental rights have been established. *See* Tenn. Code Ann. § 36-1-113(c).

The trial court determined that the evidence clearly and convincingly supported a finding of three grounds: (1) severe child abuse, (2) abandonment by failing to visit the children, and (3) failure to manifest an ability and willingness to assume custody of the children. We will discuss each ground in turn as it pertains to Mother and the three youngest children, Aurora R., Kanan R., and Kyaion R. (collectively "the Children").

### A. Severe Child Abuse

The trial court found clear and convincing evidence that Mother had severely abused the youngest child, Kyaion, by ingesting illegal drugs while pregnant.

Regarding this ground for termination of parental rights, Tennessee Code Annotated § 36-1-113(g)(4) provides:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant to this action Tennessee Code Annotated § 37-1-102(b)(27)(E) defines severe child abuse as: "Knowingly or with gross negligence allowing a child under eight

(8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]"

Our Supreme Court has explained that

a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when "he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her."

*In re Markus E.*, 671 S.W.3d 437, 464–65 (Tenn. 2023) (citations omitted).

"The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights." *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011) (quoting *State Dep't of Child.'s Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

The trial court's ruling on the issue of severe child abuse was based on the doctrine of res judicata, that being the juvenile court's finding of such in the dependency and neglect action. The doctrine applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)).

Here, however, there was not a final judgment on the issue of severe abuse from the juvenile court dependency and neglect hearing because Joseph R., the father of Kyaion, appealed the juvenile court's finding of severe abuse to the circuit court. Although Mother did not file a notice of appeal, she was automatically a party to the de novo appeal in the circuit court. *See* Tenn. Code Ann. § 37-1-159(a) ("All parties to the juvenile court proceeding shall be parties to the de novo appeal."); *see also* Tenn. R. Juv. P. 118(i).

The circuit court consolidated the termination hearing with the de novo appeal of the dependency and neglect hearing. Thus, the juvenile court's order finding that Mother committed severe child abuse was not a final judgment. As a consequence, the issue was not res judicata.

Nevertheless, as our discussion below reveals, any error by the circuit court in relying on the juvenile court order was harmless error because we have determined that the

evidence in the circuit court record clearly and convincingly established that Mother committed severe child abuse under Tennessee Code Annotated § 37-1-102(27)(A) & (E).

Kyaion was born in May 2021, and Mother testified that she learned that she was pregnant with Kyaion about two months prior to his birth. Mother tested positive for amphetamines and methamphetamines on April 19, 2021, less than a month prior to Kyaion's birth. Moreover, Mother testified that she consistently used drugs, "all of them," for about ten years, until "about four months" prior to trial. Joseph R. testified that he witnessed her drug use and used drugs, primarily opiates, with Mother for years. Based upon this and other evidence, the circuit court found that "there is no dispute that both parents were using illicit drugs while [Mother] was pregnant."

Significantly, Kyaion tested positive for amphetamines and methamphetamines at birth, and he was diagnosed with Neonatal Abstinence Syndrome (NAS). As discussed above, Tennessee Code Annotated § 37-1-102(b)(27)(E) defines severe child abuse as: "Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]"

The evidence clearly and convincingly established that Mother knowingly used illegal substances or controlled substances while pregnant with Kyaion, exposing him to drugs and causing him to be born with NAS. Thus, we affirm, albeit on different grounds, the circuit court's finding that DCS proved the ground of severe child abuse.

B.  Failure to Visit

Parental rights may be terminated for abandonment when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2021).

A parent fails to visit the child when the parent fails to visit or engage in more than token visitation. Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is "visitation [that], under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-

- 9 -

102(1)(C). It is no defense that a parent had only the means or ability to make very occasional visits if the parent made no visits during the relevant four-month period. Tenn. Code Ann. § 36-1-102(1)(E) (2021). The parent may raise and must prove the affirmative defense that her lack of visitation was not willful by a preponderance of the evidence. Tenn. Code Ann. § 36-1-102(1)(I).

The trial court made the following findings regarding this issue:

As set out above, the proof was clear that [Mother] failed to visit her children in the four (4) consecutive months immediately prior to the filing of this Petition. Here, the Petition was filed on March 28, 2022 and the Amended Petition was filed on June 14, 2022. For the Amended Petition, the relevant time frame for [Mother] is from February 14, 2022 through June 14, 2022. Even for the original Petition, the time frame would have been from November 28, 2021 through March 28, 2022. By [Mother's] own admission, she did not visit the children during this time frame, her last visit having been on April 21, 2021. Nor did she set forth any plausible justification for her failure to do so. [Mother] had the keys to unlock the visitation door, namely taking and passing a drug screen as ordered by the Meigs County Juvenile Court. She failed to do so. Therefore, the court finds that the Department has proven by clear and convincing evidence this ground for the termination of her parental rights as set forth by Tenn. Code Ann. §§ 36-1-102(1)(A)(i) and 36-1-113(g)(1).

As the trial court correctly noted, during the relevant period of time, Mother exercised no visitation with the Children. The last visit Mother had with the four older children was in April 2021. As for Kyaion, who was born on May 15, 2021, her last visit was when Mother was released from the hospital following his birth. She had never seen him since.

Mother's visitation with the Children was suspended per court order on June 8, 2021, due to Mother continuing to test positive for illegal substances, for failing to attend visits or court, and for failing to work on the permanency plans. Visitation was to resume upon Mother passing a nail bed drug screen; however, this never occurred.

Although Mother does not challenge this or any other ground, Mother argues in her best interest briefing that her lack of visitation was not willful because the court prevented her from visiting the Children. We respectfully disagree.

On June 24, 2021, following Mother's positive methamphetamine and amphetamine drug screen, the juvenile court temporarily suspended Mother's visitation with any of the children. Then, following the next court date of October 12, 2021, when it was determined that Mother had not passed any drug screens, that she had refused to submit to a

comprehensive drug screen, and that she failed to provide any prescriptions to DCS, the juvenile court required that Mother pass a nailbed drug screen prior to resuming visitation.

Thereafter, DCS arranged for three nail bed tests in November 2021, September 2022, and January 2023, provided Mother with the address of the walk-in service, and gave her a 30-day window to complete the screen each time. Mother never appeared for any of the drug screens. Mother claimed that she did not have transportation. She also stated that she would rather pay for her own drug screens, believing that DCS was involved in the ones it scheduled. However, Mother never took her own screens.

The record reveals that Mother failed to prove the affirmative defense of non-willfulness, and the trial court correctly found that Mother did not provide any plausible justification for failing to visit the Children since she had the keys to unlock the visitation door but failed to do so. *See In re Donald C.*, No. M2014-01327-COA-R3-PT, 2014 WL 7465684, at *6 (Tenn. Ct. App. Dec. 30, 2014) (lack of visitation was willful where the mother knew what she had to do in order to be permitted to visit her children but elected not to submit to the necessary drug tests to prove she was no longer taking illegal drugs). Moreover, a court order suspending visitation until certain conditions are met does not preclude a finding that a parent failed to visit. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013).

For the foregoing reasons, we affirm the finding that this ground of abandonment was proven.

### C. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court found that DCS had proven that Mother failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the Children pursuant to Tennessee Code Annotated § 36-1-113(g)(14).

Tennessee Code Annotated § 36-1-113(g)(14) reads as follows:

A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground requires that the petitioner prove two elements by clear and convincing evidence. First, the petitioner must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that "placing the child[ren] in the person's legal and physical custody would pose a risk of

- 11 -

substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Both elements must be satisfied for this ground to be established. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

As for the first element, our Supreme Court has explained that the petitioner must prove by clear and convincing evidence that the parent "has failed to manifest *either* ability or willingness." *In re Neveah M.*, 614 S.W.3d at 677. If either is proven, then the first element is satisfied. *Id.*

With regard to the second element, the court has not identified a set list of circumstances that would constitute substantial harm because of the varied forms of conduct in which substantial harm can arise. However, this court has stated that substantial harm would indicate two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. *In re Tucker H.*, No. E2019-01970-COA-R3-PT, 2020 WL 1966320, at *11 (Tenn. Ct. App. Apr. 24, 2020) (citations omitted).

In its analysis of this issue, the trial court found that custody had been removed from Mother well before DCS placed the Children in foster care. Joseph R.'s mother had custody until she relinquished custody of the Children to DCS in March 2021. As the court also noted, "since prior to the time that the Children were first removed, both [Joseph R. and Mother] have clearly failed to manifest by their actions the requisite ability to assume custody."

As noted, the first element is satisfied if the petitioner proves by clear and convincing evidence that the parent has failed to manifest either ability or willingness. *In re Neveah M.*, 614 S.W.3d at 677. Here, Mother's actions prove that she lacks the ability and willingness to actually do either. Mother never achieved stability with housing or employment, was uncooperative with service providers, and never completed appropriate substance abuse treatment. At the time of trial, Mother was employed and was renting an apartment; however, both of these had only been achieved less than a month prior to trial. Prior to this time, Mother worked for about six months at Popeyes and had not worked for about two years prior to that. Moreover, Mother did not provide any proof of housing to DCS until the day of trial; instead she told DCS that she was living off and on with relatives and friends. Furthermore, Mother was uncooperative with caseworkers.

When DCS was able to get Mother to come into the office, she often stormed out of the meetings about halfway through when the case worker requested a drug screen. Most of the meetings were to discuss the permanency plan and learn of the progress Mother was making, but in almost every meeting, Mother got angry and left prematurely. Significantly, Mother never disclosed any barriers to completing her permanency plan responsibilities.

As discussed earlier, visitation was suspended per court order on June 8, 2021, due to Mother continuing to test positive for illegal substances, not showing up for visits or court, and not working on the permanency plans. While visitation was to resume upon the passage of a nail bed drug screen, Mother never completed the screens, despite DCS scheduling and paying for tests. As mentioned previously, DCS arranged for tests in November 2021, September 2022, and January 2023, sent Mother the address of a walk-in service, and gave her 30 days to complete each drug screen, but Mother failed to do so.

As is evident from the record, Mother's substance abuse was the primary issue. Mother tested positive for suboxone, without a prescription, on September 20 and October 12, 2021, and tested positive for methamphetamines, amphetamines, and ecstasy on June 22, 2022. The last drug screen Mother completed was in October 2022, which was negative. DCS requested a drug screen in December 2022, but Mother did not attend. Mother completed an alcohol and drug assessment in October 2021 and was recommended to complete a treatment plan, but Mother never completed addiction treatment.

Thus, the record clearly demonstrates Mother's failure to manifest an ability and willingness to care for the Children.

The second element requires a showing that placing the Children in the parent's custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *In re Maya R*., No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The risk of harm need not be inevitable but must be sufficiently probable to prompt a reasonable person to believe that the harm will more likely than not occur. *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

Mother's substance abuse, as discussed earlier, along with the fact that Mother is a stranger to the Children, pose a significant risk to the Children should they be returned to her custody. At the time of trial, the three youngest children were five, two, and one and the foster parents are the only parents that the youngest child, Kyaion, knows. This is because Kyaion went straight to the foster parents' home from the hospital at about six weeks old in July 2021, where he remains. The other children were placed with the foster parents in January 2022, over a year prior to trial and the Children had not visited or had any contact with Mother since April 2021.

Significantly, the three youngest children had not asked about nor mentioned Mother. Moreover, the foster parents' home is the only home the two youngest children know, and the home where all the Children were able to overcome anxiety and behavioral issues. Thus, the record clearly proves that to remove the Children from "the stability of [the] foster home would contribute to the risk of substantial harm to [their] welfare." *In re Jeremiah B*., No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *11 (Tenn. Ct. App. Feb. 24, 2023).

For these reasons, we affirm the trial court's finding that this ground had been proven by clear and convincing evidence.

Because we have determined that a ground has been established upon which to terminate Mother's parental rights, our focus shifts to whether it is in the Children's best interests that Mother's rights be terminated. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005).

## III.    BEST INTEREST FACTORS

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, "the interests of parent and child diverge, and the focus shifts to what is in the child's best interest." *In re Jude M.*, 619 S.W.3d 224, 244 (Tenn. Ct. App. 2020) (citations omitted). As such, the courts must review each relevant factor from the child's, rather than the parent's, perspective. *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).

Tennessee Code Annotated § 36-1-113(i) provides a non-exhaustive list of factors for courts to consider in determining whether termination is in a child's best interest.[4] "These statutory factors are illustrative, not exclusive, and any party to the termination proceedings is free to offer proof of any other factor relevant to the best interest analysis." *In re Gabriella D.*, 531 S.W.3d at 681.

The trial court conducted a thorough analysis of the relevant factors and found that DCS had proven by clear and convincing evidence the following best interest factors as set out in Tennessee Code Annotated § 36-1-113(i) and found that "said factors weigh heavily in the court's determination that it is in the best interests of the child[ren] for the parental rights to be terminated."

Before analyzing the individual factors relative to Mother, the trial court addressed the current placement of the Children. As stated in the final order:

> The court finds that, perhaps for the first time in their respective lives, the children are in a good place. Their residential, educational, social, medical and other needs are clearly being met by the [foster parents]. Indeed, the testimony is clear that even with all of the trauma they have endured throughout their lives and, particularly in respect to [Kyaion R.] and his medical needs, these children are thriving. The court finds it is in their best interests that their parents' parental rights be terminated.

---

[4] The statute was amended in 2021, prior to the commencement of this action, and the trial court correctly identified and considered the factors set forth in the amended version of Tennessee Code Annotated § 36-1-113(i).

Then the court addressed several, but not all, of the other factors.[5]

Regarding statutory factor (A), the trial court found that:

As to [Mother], the above proof demonstrates that she clearly has had, and most likely still has, a drug addiction problem that has not been properly addressed through treatment. While she testified that she is no longer using illegal drugs, the court is not convinced that is the case. While the proof did demonstrate that she currently has a job, her employment with the current job has been short-term. Her previous job at a fast food restaurant lasted for a short period of time. Further, her current housing arrangement impressed the court as quite odd with no assurance of long-term or even medium-term security. She testified that she was living with her uncle and had a lease with him. While that may be true, the court cannot say that such an arrangement would be in the best interests of the children from a stability and continuity of placement perspective. Further, [Mother's] history of losing custody, and the circumstances surrounding the loss of custody, strongly favor termination from a stability and continuity perspective.

Having reviewed the record, we have determined that the evidence preponderates in favor of these findings.

As to statutory factor (B), the court found that a change of caretakers and physical environment would have a substantial negative effect on the Children's emotional, psychological and medical condition. After again noting that the Children are currently in a very stable home and are thriving, the court found the proof to be "overwhelming that changing from the [foster parents] to [Mother] would have had a deleterious effect on the Children's emotional, psychological and medical condition." The evidence preponderates in favor of this finding.

Statutory factor (C) requires the court to evaluate whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. The trial court found that "there was no continuity and stability in respect to the Children's basic material, educational and housing needs while the Children were in the custody of the parents, and there is ample proof that those needs are being met by DCS through the [foster parents]." The evidence in the record supports these findings.

As to statutory factor (E), the trial court found:

---

[5] The trial court is only required to consider the relevant factors. Tenn. Code Ann. § 36-1-113(i)(1).

it is clear that neither of the [parents] maintained regular visitation or other contact with the children during the relevant statutory period. The court would simply note again that both of them had the keys to unlock the visitation door if one or both of them had taken and passed the drug screen required by the Meigs Juvenile Court. They did not.

Having reviewed the record, we have determined that the evidence preponderates in favor of these findings.

As for statutory factor (H), which requires that the court consider whether the Children have created a healthy parental attachment with another person or persons in the absence of the parent, the court stated, "[I]t is clear to the court that the children, while understandably reluctant at first, have established such an attachment with the [foster parents]." The evidence in the record supports these findings.

As for statutory factor (J), the court found that neither parent had demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the Children to be in the home of Mother. The court stated that it was "simply not convinced and finds that [DCS has] proven by clear and convincing evidence that the circumstances that led to the finding of the dependency and neglect and the subsequent removal of the child[ren] have not been remedied." We agree with these findings.

As for statutory factor (S), the court stated:

The court has already addressed in detail the failure of the Respondents to provide financial support to the child[ren] during the relevant time period and has further evaluated the support issue pursuant to § 113(i)(1)(S) in p[er]forming the best interest analysis. The court finds that this factor is another factor that the Petitioners have proven, establishing that it is the best interest of the children for the Respondents' parental rights to be terminated.

Having reviewed the record we find that the evidence preponderates in favor of these findings.

In its summation of its best interest analysis, the trial court found that DCS had proven by clear and convincing evidence that termination of the parental rights of Mother is in the best interest of the Children.

Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Gabriella D.*, 531 S.W.3d at 681. As we stated in our assessment of each factor above, we find that the evidence preponderates in favor of each of the trial court's best interest findings.

We must now consider the combined weight of the best interest factors to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. *Id.*; *see also In re Kaliyah S.*, 455 S.W.3d 533, 555–56 (Tenn. 2015). Having done so, we find, as the trial court did, that the combined weight of these factors proved by clear and convincing evidence that termination of Mother's parental rights is in the best interests of the Children.

Accordingly, we affirm the trial court's determination that termination of Mother's parental rights is in the best interests of the three youngest children, Aurora R., Kanan R., and Kyaion R.

Having affirmed the trial court's determination that grounds have been proven and that termination of Mother's parental rights is in the best interests of Aurora R., Kanan R., and Kyaion R., we affirm the termination of Mother's parental rights to Aurora R., Kanan R., and Kyaion R.[6]

## CONCLUSION

For the reasons stated above, we vacate that portion of the judgment terminating Mother's parental rights to Destiney S. and Serenity S. With regard to the three youngest children, Aurora R., Kanan R., and Kyaion R., we affirm the trial court's determination that grounds for termination of Mother's parental rights were proven and that termination of Mother's parental rights is in their best interests. Accordingly, we affirm the termination of Mother's parental rights to Aurora R., Kanan R., and Kyaion R. Costs of appeal are assessed against the appellant, Bridget R.

_____
FRANK G. CLEMENT JR., P.J., M.S.

---

[6] As noted earlier, the two oldest children, Destiney S. and Serenity S., the twins, had attained the age of majority prior to the entry of the final judgment. Thus, we have vacated the termination of Mother's parental rights to Destiney S. and Serenity S.